COLGATE–PALMOLIVE COMPANY, COLGATE–PALMOLIVE COMPANY, DISTR., demandante y peticionaria, *v.* MISTOLÍN DE PUERTO RICO, INC., demandados y recurridos.

*Número:* O-85-137 *Resuelto:* 2 de mayo de 1986

314

316

*Maggie Correa Avilés,* de *McConnell, Valdés, Kelley, Sifre, Griggs & Ruiz Suria,* abogada de la parte recurrente; *Federico Calaf Legrand,* de *Reichard, Colberg & Calaf,* abogado de la parte recurrida.

EL JUEZ ASOCIADO SEÑOR NEGRÓN GARCÍA emitió la opinión del Tribunal.

## I

Este litigio suscita cuestiones importantes sobre el estado del derecho de marcas de fábrica en Puerto Rico.

Sus antecedentes fácticos se remontan al 1976. Mistolín de Venezuela, ideó la frase "Mistolín hace feliz a su nariz" para la promoción de sus productos. Posteriormente Colgate-Palmolive la copió y usó en mercados donde no habían penetrado los artículos de Mistolín. Así Colgate-Palmolive adquirió su uso exclusivo *como marca de fábrica* en Colombia y Uruguay, y Mistolín en Venezuela, Panamá y República Dominicana.

En 1980 Mistolín de P.R., Inc., comenzó a distribuir sus productos en la isla. Desde ese año hasta el 23 de septiembre de 1983 no utilizó en su publicidad y productos la frase. Desconocemos los motivos.

El 7 de agosto de 1983, Colgate-Palmolive inició una costosa y agresiva campaña publicitaria.(1) Como distintivo

---

(1) Desde el 7 de agosto de 1983 hasta el 23 de febrero de 1984 se invirtieron unos $140,000 en la prensa, televisión y radio. Para 1984 y 1985 esperaban desembolsar unos $700,000 por año. La frase es parte central de la campaña.

anunciaba el producto Fabuloso con el "eslogan" (²) "Hace feliz a su nariz". El 23 de septiembre, mes y medio después, Mistolín empezó a adherir físicamente la frase a su producto limpiador desodorante Mistolín. Este es muy similar al producto Fabuloso. Ambos son limpiadores desodorantes con el concepto de olor y color floral y se dirigen al mismo público. El 11 de octubre Mistolín solicitó al Departamento de Estado la inscripción como marca de fábrica de la frase conforme la Ley de Marcas de Fábrica de P.R. —Núm. 66 de 28 de julio de 1923. (10 L.P.R.A. sec. 191 *et seq.*)

Colgate-Palmolive advino en conocimiento de esa solicitud a través de edictos. El 23 de febrero de 1984 se opuso. Simultáneamente requirió que se registrara a su favor por haber comenzado a unirla a Fabuloso ese mismo día. Luego de evaluar la prueba documental de ambas, el Departamento de Estado resolvió que Mistolín fue la primera en utilizarla, y que dicho uso, y no el publicitario, era el criterio determinante sobre la existencia de una marca de fábrica. Admitió la registración para beneficio de Mistolín. Colgate-Palmolive acudió al Tribunal Superior, Sala de San Juan, para impugnar ese dictamen. Dicho foro confirmó, e invocó la doctrina de

---

Por otro lado, Mistolín sometió en el Departamento de Estado el *Exhibit* J consistente en unas facturas de WKAQ–TV sobre anuncios del producto Mistolín desde octubre de 1983 hasta abril de 1984, que totalizaban la suma de $190,375. Sin embargo, las facturas no especifican si en dichos anuncios se usaba la frase "Hace feliz a su nariz", como tampoco se acreditó tal hecho por declaración jurada.

(²) La voz "eslogan" es de origen inglés. No tiene equivalente preciso en español, se trata de un lema comercial breve y llamativo. Por esta razón nuestra lengua lo ha tomado como *préstamo* del inglés. M. Gili Gaya, *Nuestra Lengua Materna,* San Juan, Ed. Inst. Cultura Puertorriqueña, 1965, Cap. 11, págs. 115–117. Al principio el préstamo era puro —se escribía como en la lengua original— hoy su ortografía se ha castellanizado. Véase *Diccionario general ilustrado de la lengua española,* 3ra ed. rev., Barcelona, Ed. Bibliograf, 1976, pág. 672.

deferencia hacia el organismo administrativo.([3]) A solicitud de Colgate-Palmolive, revisamos.

Desde sus inicios la teoría de Colgate-Palmolive ha sido sostener que si bien Mistolín de Venezuela creó la frase, ello es irrelevante, pues lo determinante es quién fue el primero en apropiársela en el territorio o mercado en particular. Aunque Mistolín fue la primera en adherirla a sus productos, Colgate-Palmolive la usó antes en publicidad en Puerto Rico y la comenzó a fijar en Fabuloso el mismo día que se opuso a la solicitud de Mistolín. Argumenta además, que el Departamento de Estado erró al inscribir la frase a favor de Mistolín, pues para impedirlo no tenía que demostrar un derecho superior al de Mistolín. A su juicio bastaba probar la probabilidad: (1) del daño al opositor, y (2) de confusión en el público respecto al origen de los productos.

En su alegato suplementario Colgate-Palmolive esbozó, como nueva teoría, que tiene derecho a inscribir la frase, pues aunque ésta es descriptiva y por ende no registrable por disposición de nuestra Ley de Marcas de Fábrica, 10 L.P.R.A. sec. 194(e), cobró significación secundaria en virtud de la propaganda realizada. *Cooperativa Cafeteros* v. *Colón Colón*, 91 D.P.R. 372, 388 (1964).

Por su parte Mistolín defiende su derecho a inscripción y propiedad como creadora de la frase. Aduce que Colgate-Palmolive alegadamente la plagió a través de su compañía publicitaria —que es la misma tanto aquí como en Venezuela— lo cual constituye *competencia desleal*. Además Mistolín recalca que fue la primera en adherir la frase a sus productos, lo cual

---

([3])Durante el proceso Mistolín registró la frase como marca de fábrica en la Oficina Federal de Patentes. Por su parte Colgate incoó demanda por alegados daños y perjuicios contra Mistolín por competencia injusta en pleito separado ante el Tribunal Superior, Sala de San Juan, Civil Núm. PE-84-1305.

El trámite en ese caso se paralizó hasta la decisión en el presente. (Minuta del 6 de mayo de 1985.)

entiende es el criterio rector que crea el derecho exclusivo de marca de fábrica y no la publicidad.

La controversia, nueva en esta jurisdicción, plantea varias interrogantes: ¿De qué forma se adquiere en Puerto Rico el derecho exclusivo sobre una marca? ¿Bajo qué circunstancias procede su inscripción? ¿Qué protección jurídica ameritan los símbolos y frases distintivas usadas en publicidad? Estas cuestiones nos obligan a realizar una breve incursión en el concepto de marca de fábrica y definir sus fundamentos.

## II

■ El derecho marcario versa sobre la normativa jurídica que regula y brinda protección a los símbolos comerciales conocidos como marcas. (⁴) Aunque la Ley de Marcas de Fábrica no provee definición alguna, nuestro ordenamiento penal suple, en cierto modo, esa laguna. Así el Art. 314 del Código Penal de 1902 (⁵) reza:

*Marca de fábrica, definición de*

La frase "marca de fábrica" [,] empleada en las tres secciones anteriores, comprende toda palabra, letra, divisa, emblema, sello, impreso, marbete, rótulo, etiqueta o cubierta, que suele fijar el artífice, fabricante, droguista, comerciante o mercader, para denotar que algún artículo o producto es importado, fabricado, producido, compuesto o vendido por él, a distinción de cualquier nombre, palabra o expresión generalmente empleada para denotar determinada clase de artículos. 33 L.P.R.A. sec. 1314.

■ La definición es preponderantemente descriptiva. Esta característica responde a lo difícil que es estructurar una

---

(⁴) En adición a las marcas, los nombres de empresas (*tradenames*) —mientras no hayan adquirido significación secundaria— y los rótulos son algunos de los símbolos de comercio más conocidos.

(⁵) Por disposición expresa del Art. 278 del Código Penal de 1974 (33 L.P.R.A. sec. 4622), los Arts. 311–317 del viejo Código Penal continúan vigentes, 33 L.P.R.A. secs. 1311–1317. Estos artículos configuran el delito de copiar o falsificar una marca de fábrica perteneciente a otro.

apuntalada en el concepto de marca. Por esta razón, se ha opinado que la mejor definición de una marca es describir su función esencial. 1 *Nims, Unfair Competition and Trade-Marks* Sec. 187, pág. 516 (4ta ed. 1947). Este reputado tratadista se hace eco de una cita clásica de finales del siglo pasado del Juez Vann, quien en *Waterman* v. *Shipman*, 130 N.Y. 301, 311, 29 N.E. 111 (1891), dijo: "[l]a función de una marca de fábrica es señalar al hacedor [Nims añadiría: y al vendedor] del artículo al que está adherida". (Traducción nuestra.) Por su parte, la Ley (Lanham) Federal sobre Marcas de Fábrica de 1946 (60 Stat. 427, 15 U.S.C. sec. 1051 *et seq.*) define marcas como "cualquier palabra, nombre, símbolo o medio (*device*) o cualquier combinación de éstos adoptada y usada por el manufacturero o comerciante para identificar sus productos y distinguirlos de los manufacturados o vendidos por otros". (Traducción nuestra.) 15 U.S.C. sec. 1127.

De un examen de estas definiciones observamos que el concepto *marca de fábrica* tiene perfiles muy propios. En aras de la brevedad podemos decir que *una marca* es un símbolo —en sentido amplísimo— *mediante el cual el comerciante identifica sus productos*. Esta expresión definitoria recoge la función originaria e histórica de las marcas, a saber, *diferenciar*. En la práctica, la marca no sólo señala el origen del producto, sino también su *calidad* e *individualidad*. *Cf. Colón* v. *Carlos Martínez, Inc.*, 112 D.P.R. 846 (1982).(⁶)

_____

(⁶) Son múltiples las funciones de las marcas. Sirven para indicar la procedencia de los artículos. 3 *Callmann, Unfair Comp., Trademarks & Monopolies* Sec. 17.02 (4ta ed. 1986). Garantizan —al menos en la conciencia del vendedor y del comprador— la consistencia en la calidad del producto. Ibíd., Sec. 17.03. Véanse: N. Isaacs, *Traffic in Trade-Symbols*, 44 Harv. L. Rev. 1210, 1220 (1931); *Howard Dustless Duster Co.* v. *Carleton*, 219 F. 913, 915 (D. Conn. 1915); *Coca-Cola Co.* v. *State*, 225 S.W. 791, 794 (Tex. Cir. 1920); M. F. Goldstein, *Products Liability and the Trademark Owner: When a Trademark is a Warranty*, 67 T.M.R. 587 (1977); Nota, *Tort Liability of Trademark Licensors*, 55 Iowa L. Rev. 693 (1970). Por último, pue-

El interés adquirido sobre una marca es un derecho propietario. *Cooperativa Cafeteros* v. *Colón Colón*, supra, pág. 387; H. Baylos Corroza, *Tratado de Derecho Industrial*, Madrid, Ed. Civitas, 1978, págs. 95 *et seq.*, 793 *et seq.*; 1 Nims, *op. cit.*, Sec. 198; 1 *McCarthy, Trademarks and Unfair Competition* Sec. 2.6 (2da ed. 1984). La Sec. 1 de la Ley de Marcas, 10 L.P.R.A. sec. 191, así lo caracteriza al referirse al "dueño de una marca". Sin embargo, el estatuto guarda silencio sobre cómo se adquiere la propiedad sobre una marca. Curiosamente sólo provee mecanismos para la registración de marcas ya existentes. Históricamente la normativa reguladora de las marcas era muy similar tanto en los países civilistas como en los anglosajones. Tal similitud se ha explicado de diferentes formas. La más convincente es la que postula el origen de equidad del derecho de marcas. Por esta razón ante problemas similares, diferentes países reaccionaron de forma parecida. *Cf.* D. M. McClure, *Trademarks and Unfair Competition: A Critical History of Legal Thought*, 69 T.M.R. 305 (1979); S. D. Diamond, *The Historical Development of Trademarks*, 65 T.M.R. 265 (1975); B. G. Paster, *Trademarks—Their Early History*, 59 T.M.R. 551 (1969); D. Leeds, *Trademarks—Our American Concept*, 46 T.M.R. 1451 (1956). Desde esta óptica nuestro derecho de marcas tiene como fundamento jurídico los conceptos implícitos en nuestra Ley de Registro de Marcas, los usos y costumbres comerciales —Art. 2 del Código de Comercio—, la protección que otorga

---

den funcionar como un distintivo que atraiga la atención del público (función publicitaria). 3 Callmann, *op. cit.*, Sec. 17.04; *Northam Warren Corp.* v. *Universal Cosmetic Co.*, 18 F.2d 774 (7mo Cir. 1927); *United States* v. *Beatrice Foods Co.*, 344 F. Supp. 104 (D. Ct. Cir. Minn. 1972). El uso de marcas en esta última capacidad ha tenido fuertes opositores —R. S. Brown, Jr., *Advertising and the Public Interest: Legal Protection of Trade Symbols*, 57 Yale L. J. 1165 (1948)— aunque realmente la crítica se ha concentrado no tanto en las marcas como en el uso de una propaganda persuasiva e "irracional". 3 Callmann, *op. cit.*, Sec. 17.04.

nuestro ordenamiento a la propiedad en general, la teoría de la competencia ilícita y la equidad, Art. 7 del Código Civil.

■ Nuestra ley *presupone* un sistema de derecho sustantivo. Esta particularidad responde a que estamos ante una legislación con raíz en la Ley de Marcas federal de 1905, ya derogada, que no regulaba el aspecto sustantivo de las marcas, pues dejaba el mismo a los estados.(⁷) Encontrando nuestra legislación su ascendencia en la Ley de Marcas federal de 1905 tenemos que concluir que el legislador ha admitido en Puerto Rico el sistema marcario norteamericano. Así la jurisprudencia de esa latitud goza de un valor altamente persuasivo. *Garriga Trad. Co., Inc.* v. *Century Pack. Corp.*, 107 D.P.R. 519, 522 (1978).

■ En Estados Unidos la doctrina reconoce cuatro requisitos indispensables para la génesis del derecho exclusivo sobre una marca. Primero, que el símbolo sea susceptible de ser apropiado como marca —1 Nims, *op. cit.*, Sec. 200 *et seq.*—, inmediatamente o mediante la adquisición de significación secundaria. 1 McCarthy, *op. cit.*, Caps. 12–15. Segundo, que se adhiera físicamente al producto. Este requisito lo exige implícitamente nuestra ley al exigir que el registrante explique en la solicitud "la manera de aplicar o fijar la marca a los artículos". 10 L.P.R.A. sec. 191. Este acto se le conoce como *affixation* y es "un elemento esencial para una marca de fábrica válida". 1 Nims, *op. cit.*, Sec. 218, pág. 636. A modo de

(⁷)La razón histórica se halla en los célebres *Trade–Mark Cases*, 100 U.S. 82 (1879). El Supremo federal invalidó la Ley de Marcas federal de 1870 que regulaba sustantivamente la materia. Ante el planteamiento de inconstitucionalidad aducido de que se pretendía regir el derecho sustantivo de marcas más allá del poder concedídole bajo la cláusula de Comercio, el Congreso, desde ese entonces, ha optado por dejar casi todos los aspectos sustantivos a los estados. 2 *Antieau, Modern Constitutional Law* Sec. 12:144 (1969). Ello no quiere decir que haya una ausencia absoluta de guías sustantivas. El propio lenguaje y esquema de la ley implícitamente las contiene, aunque no de forma uniforme.

paréntesis, cabe señalar que la ley federal vigente ha atemperado este requisito para fines de la registración federal. Ley Lanham, Sec. 45 (15 U.S.C. sec. 1127).(8) Tercero, que haya una distribución o venta *bona fide* del producto. 1 Nims, *op. cit.*, Secs. 214 y 218; E. Vandenburgh, *Trademark Law and Procedure* Sec. 2.10, pág. 53 (2da ed. 1968). Y cuarto, que el adquirente tenga prioridad y exclusividad en el uso de la marca frente a otros, aun cuando éstos no utilicen el símbolo, en rigor, como marca de fábrica. 1 Nims, *op. cit.*, Sec. 217; 1 McCarthy, *op. cit.*, Sec. 16.1 *et seq. Cf. Bayuk Cigars* v. *Schwartz*, 1 F. Supp. 283 (D.N.J. 1932); *Blue Bell, Inc.* v. *Farah Manufacturing Company, Inc.*, 508 F.2d 1260 (5to Cir. 1975). Excepto en los casos en que el símbolo necesite significación secundaria, el derecho sobre una marca puede nacer en el mismo momento de su primer "uso".(9) 1 Nims, *op. cit.*, Sec. 218; Vandenburgh, *op. cit.*, Sec. 2.10, pág. 54. A todos estos requisitos se le ha añadido la buena fe.(10)

---

(8) Bajo esta sección para cualificar como marca basta que el símbolo se haya exhibido (*display*) en relación con los productos. De esta forma la Ley Lanham reconoce cierta relevancia marcaria a la publicidad, lo que no es precisamente una novedad. Véase *Oakes* v. *St. Louis Candy Co.*, 146 Mo. 391, 48 S.W. 467 (Sup. Ct. 1898).

(9) "Uso" en rigurosa terminología marcaria significa (a) *adhesión* de la marca en los productos; más (b) su venta o distribución. E. Vandenburgh, *Trademark Law and Procedure* Sec. 1.22, pág. 22 (2da ed. 1968).

(10) *Ubeda* v. *Zialcita*, 226 U.S. 452 (1913); *Hanover Milling Co.* v. *Metcalf*, 240 U.S. 403 (1916); *United Drug Co.* v. *Rectanus Co.*, 248 U.S. 90 (1918); *White Tower System* v. *White Castle System, Etc.*, 33 U.S.P.Q. 573, 90 F.2d 67 (6to Cir. 1937); *Aluminum Fabricating Co.* v. *Season-All Window Corp.*, 116 U.S.P.Q. 335, 160 F. Supp. 41 (S.D.N.Y. 1957), *cf.* 119 U.S.P.Q. 61, 259 F.2d 314 (2do Cir. 1958); *Fry* v. *Layne-Western Company*, 126 U.S.P.Q. 423, 282 F.2d 97 (8vo Cir. 1960); *Pike* v. *Ruby Foo's Den*, 109 U.S.P.Q. 78, 232 F.2d 683 (Cir. D.C. 1956); *Triumph Hosiery Mills, Inc.* v. *Triumph Internat'l Corp.*, 128 U.S.P.Q. 536, 191 F. Supp. 937 (S.D.N.Y. 1961); *Merry Hull & Company* v. *Hi-Line Co.*, 146 U.S.P.Q. 274, 243 F. Supp. 45 (S.D.N.Y. 1965); *O'Connor & Gordon, Inc.* v. *Handicraft Publications*, 103 U.S.P.Q. 251, 206 Misc. 1087, 136 N.Y.S.2d 558 (1954); *Langendorf United Bakeries* v. *General Foods Corp.*, 62 U.S.P.Q. 323, 125 F.2d 159 (C.C.P.A. 1942); *United States Plywood Corp.* v. *Treib*, 114 U.S.P.Q. 343 (Com. of Pat. 1957); *Thompson & Sons, Inc.* v. *Brooks et al.*, 150 U.S.P.Q.

## III

■ Como regla general las marcas de fábrica sólo reciben protección jurídica dentro de determinado mercado y jurisdicción. (¹¹) En lo concerniente a las marcas la extensión territorial del derecho es coextensiva a la extensión territorial de su *uso*. F. De Solá Cañizares, *Tratado de Derecho Comercial Comparado*, Barcelona, Ed. Montaner y Simón, 1962, T. II, pág. 438. *Cf. Hanover Milling Co.* v. *Metcalf*, 240 U.S. 403 (1916), (*The TCA Rose Case*) —legislativamente revocado, *Foxtrap, Inc.* v. *Foxtrap, Inc.*, 671 F.2d 636 (App. D.C. 1982); *United Drug Co.* v. *Rectanus Co.*, 248 U.S. 90 (1918)— legislativamente revocado, véase *Foxtrap, Inc.* v. *Foxtrap, Inc.*, supra. (¹²) Lo verdaderamente relevante en este tipo de controversias es el uso del símbolo en la jurisdicción o mercado en que se encuentra el foro, en este caso, Puerto Rico. Solá Cañizares, *op. cit.*, págs. 550–551. *Cf.* Vandenburgh, *op. cit.*, Secs. 2.40 a 2.42. Los tribunales puertorriqueños no estamos en el sitial de los foros judiciales internacionales, vindi-

---

65 (T.M. Bd. 1966); *Hans Holterbosch, Inc.* v. *Rheingauer Schaumweinfabrik Schierstein*, 110 U.S.P.Q. 543 (Com. of Pat. 1956); *Marina Publications, Inc.* v. *Haydon*, 130 U.S.P.Q. 278, 280, 281 (T.M. Bd. 1961); *HMH Publishing Co., Inc.* v. *John Raumgarth Co.*, 129 U.S.P.Q. 327 (T.M. Bd. 1961). Pero véanse: *Bayuk Cigars* v. *Schwartz*, 14 U.S.P.Q. 132, 1 F. Supp. 283 (D.N.J. 1932); *Potter-Wrightington* v. *Ward Baking Co.*, 288 F. 597 (D. Mass. 1923), *cf.* 298 F. 398 (1er Cir. 1924). *Cf. Dynasty Room, Inc.* v. *Whiskey-A-Go-Go, Inc.*, 150 U.S.P.Q. 477, 478, 186 So. 2d 402 (4to Cir. 1966).

(¹¹) Ciertas disposiciones de la Ley Lanham y algunos tratados internacionales constituyen la excepción.

(¹²) En *Foxtrap, Inc.* v. *Foxtrap, Inc.*, 671 F.2d 636 (App. D.C. 1982) se explica que un registrante *bona fide* bajo la Ley Lanham tiene protección a través de todo el territorio de Estados Unidos, aunque en la realidad no cubra todos los mercados de la nación. Sec. 22 de la Ley Lanham, 15 U.S.C. sec. 1972; *cf.* Sec. 33(b), 15 U.S.C. sec. 1115(b). 1 *McCarthy, Trademarks and Unfair Competition* Cap. 26 (2da ed. 1984). Pero Véase *Oakford Company* v. *Kroger Company*, 157 F. Supp. 453 (D. Ill. 1957); 116 U.S.P.A. 430 (1957). La protección que la Sec. 22 da al dueño de la marca y su propiedad se determinan por preceptos del *Common Law. Armstrong Co.* v. *Nu-Enamel Corp.*, 305 U.S. 315 (1938).

cadores de la moralidad comercial a escala supranacional. Si el valor jurídico supuestamente lesionado no tiene vida en nuestra jurisdicción, en ausencia de una ley federal o tratado internacional de aplicación local para protegerla, nada podemos remediar.

En este aspecto no podemos refrendar la tesis propuesta por Mistolín de extender nuestro análisis jurídico al mercado internacional. No podemos emprender esa incursión, pues careceríamos de jurisdicción en esta particular situación.

## IV

Aclarados los límites de nuestra intervención al marco jurídico del mercado local, y expuestos los conceptos fundamentales que suscita el recurso, concentrémonos en los méritos de los planteamientos de las partes.

■ En primer término, examinemos la registrabilidad del "eslogan" "Hace feliz a su nariz". De su faz, la cuestión no es sencilla. Se han elaborado distintos criterios para tal evaluación. Una de las exposiciones más precisa, y que merece nuestra aprobación, fue resumida por el Tribunal de Apelaciones para el Primer Circuito Federal de Boston:

> Tanto la Ley Lanham como la jurisprudencia del "common law" diferencian cuatro categorías de términos para propósitos de análisis marcario: (1) genéricos, (2) descriptivos, (3) sugestivos, y (4) arbitrarios o imaginarios. Véase *Miller Brewing Co.* v. *G. Heileman Brewing Co.,* 561 F.2d 75 (7mo Cir. 1977), *cert.* denegado, 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 772 (1978); *Abercrombie & Fitch Co.* v. *Hunting World, Inc.,* 537 F.2d 4 (2do Cir. 1976). Un término descriptivo meramente describe una característica o ingrediente del artículo al cual se refiere. Un término descriptivo sólo puede llegar a ser una marca de fábrica si adquiere significación secundaria, de forma tal que el consumidor asocie el término con los bienes de un productor en particular. Un término sugestivo sugiere, más que describe, las características de los bienes a los cuales está adherido. Tal término,

que evoca la imaginación perceptiva del consumidor, puede ser protegido sin prueba de significación secundaria. Finalmente, un término arbitrario no tiene relación lógica o sugestiva con las características reales de los productos. Tal término es casi siempre protegible pues, a diferencia de un término sugestivo, no es susceptible de ser atacado por ser meramente descriptivo. Hasta un término imaginario puede, de todas formas, convertirse en genérico a través del uso. (Traducción nuestra.) *Keebler Co.* v. *Rovira Biscuit Corp.*, 624 F.2d 366, 374 n. 8 (1er Cir. 1980).

Véase además, *Colón* v. *Carlos Martínez, Inc.*, supra, donde definimos lo que es un vocablo general.

■ Notamos, pues, que la diferencia entre un término descriptivo y uno sugestivo es algo confusa. 3 *Callmann, Unfair Comp., Trademarks & Monopolies* Sec. 18.09 (4ta ed. 1986). Para diferenciarlos se han desarrollado varios criterios (*tests*). Primero, el de "grado de imaginación". Según éste, la calificación depende del grado de imaginación que debe utilizar una persona promedio para obtener, a través del término, alguna descripción del producto. Así, mientras un término descriptivo directa y claramente transmite información sobre los ingredientes, cualidades y características del producto, el sugestivo sólo "sugiere" esas características. Segundo, el criterio de "necesidad de los competidores". Bajo este análisis la calificación depende del grado en que los competidores necesitan del término para describir y anunciar sus propios productos. Y tercero, el "uso por los competidores". Este enfoque se centra en el grado en que otros competidores han utilizado el término respecto a mercancía similar. 1 McCarthy, *op. cit.*, Sec. 11.21. Aun así, se ha señalado que en la realidad y práctica cotidiana, los tribunales usan como medida (*test*) la intuición. 1 McCarthy, íd.

■ Al confrontar estos criterios con la frase "Hace feliz a su nariz" se pone de manifiesto que estamos ante un término *sugestivo*. Según antes reseñado, el examen califica-

dor está predicado esencialmente en la "relación" entre la mercadería y el término o frase. Mientras más cercana sea esa relación, más descriptivo será; a *contrario sensu*, mientras más lejana, más arbitraria. En algún punto intermedio se encuentran los términos sugestivos. Bajo este criterio, ¿qué relación guarda la frase "Hace feliz a su nariz" con un limpiador desodorante? Evidentemente necesitamos cierta imaginación para relacionarla con su "cualidad" desodorante. Es menester meditar un poco para percatarse de que la idea que se quiere transmitir es el bienestar que causa al sentido del olfato el agradable olor del producto anunciado. En resumen, se trata, pues, de una frase "sugestiva", inscribible sin necesidad de significación secundaria.

## V

Establecido que la frase es inscribible, tócanos ver el papel que desempeña la publicidad en los procedimientos de inscripción de marcas en el Departamento de Estado a la luz del derecho marcario. De inmediato surge su importancia. ([13]) Según antes señalado, las marcas pueden realizar una importante función publicitaria. Sin embargo, la propaganda, por sí sola no crea marcas de fábrica. El uso publicitario no es el uso necesario para que dé genesis a ese derecho. *Consumers Petroleum Co.* v. *Consumers Co. of Illinois*, 169 F.2d 153 (7mo Cir. 1948); *Gray* v. *Armand Co.*, 24 F.2d 878 (D.C. Cir. 1928); *cf.* 3 Callmann, *op. cit.*, Sec. 19.08. Ello no significa que la propaganda carezca de relevancia y valor jurídico. ([14]) La publicidad puede alcanzar y equivaler al uso

---

([13]) No nos toca pronunciarnos en este recurso sobre la responsabilidad que pueda incurrir el que indebidamente utiliza la publicidad. Nuestro interés gira en torno a la publicidad como generadora de valores protegibles.

([14]) Por medio de la publicidad un término descriptivo puede adquirir significación secundaria —*Cooperativa Cafeteros* v. *Colón Colón*, 91 D.P.R. 372 (1964); Vandenburgh, *op. cit.*, Sec. 4.71; 1 McCarthy, *op. cit.*, Secs.

"análogo" necesario que conforme nuestra ley impida la registración de una marca por otra persona. Veamos.

 Hemos indicado que nuestra ley de marcas es de carácter registral, no sustantivo. El esquema legislativo provee para que una petición de inscripción *ex parte* no afecte los derechos de terceros. A tales efectos contiene como salvaguarda la publicación de edictos para notificar la petición de inscripción. 10 L.P.R.A. sec. 195. En virtud de esa notificación, los derechos de cualquier tercero también interesado se pueden hacer valer a través de tres procedimientos *inter partes* de naturaleza contenciosa. Estos son de: (1) *oposición*, en que el "promovente" trata de impedir la registración a favor del "promovido". Ibíd.; (2) *cancelación*, donde el promovente interesa que se cancele la inscripción. Ibíd., Sec. 200, y (3) *interferencia* que acontece cuando dos marcas incompatibles buscan los beneficios registrales.([15]) Ibíd., Sec. 196.

 Bajo estas distintas alternativas procesales, al caso de autos podemos clasificarlo una *interferencia*. Colgate-Palmolive compareció al Departamento de Estado a oponerse a que se registrara la marca a favor de Mistolín, y también solicitó la inscripción a su favor.([16]) En estas circunstancias, es aplicable la Sec. 6 de la Ley de Marcas de Fábrica, 10 L.P.R.A. sec. 196, que reza:

---

15.17, 18— o una plusvalía protegida por principios de competencia justa. 3 Callmann, *op. cit.*, Sec. 17.04; 1 *Nims, Unfair Competition and Trade-Marks* Sec. 16 (4ta ed. 1947); 1 Callmann, *op. cit.*, Sec. 1.11.

([15]) Nótese que en los casos de interferencia, una de las marcas puede estar ya registrada. 10 L.P.R.A. sec. 196.

([16]) En las oposiciones y cancelaciones la legitimación activa del promovente depende del daño probable (no real) que podría sufrir si se inscribe la marca a favor del promovido. En la interferencia basta mostrar que se tiene una marca. *Cf.* I *Seidel, Dabueff & Gonda, Trademark Law and Practice* Sec. 22 *et seq.* (1963).

*196. —Notificación de oposición, suficiencia; conflicto*

En los casos en que se presente una oposición, el Secretario de Estado lo notificará al solicitante, exponiéndole los fundamentos de la misma.

Cuando se presente una solicitud para el registro de una marca de fábrica que es sustancialmente idéntica a una marca aplicada a la venta de artículos de las mismas propiedades descriptivas, y la cual marca se halla registrada en el Departamento de Estado a nombre de otro, o que previamente se haya presentado solicitud, o que se parezca a tal marca de fábrica, o a otra ya conocida que pertenezca y se use por otro, que, en la opinión del Secretario de Estado pueda inducir a engaño público, *el Secretario de Estado decidirá quién tiene el derecho al uso de la marca, y sobre la suficiencia de las objeciones hechas al registro.*

El Secretario de Estado puede rechazar el registro de una marca a que se haya hecho objeción, en vista de la suficiencia de los fundamentos de la oposición. Cuando dos o más marcas estén pendientes de registro, y estén en conflicto por su semejanza, el Secretario de Estado decidirá cuál de éstas tendrá derecho al registro, basándose en la prioridad en cuanto al uso de la misma, hecho que habrá de probársele satisfactoriamente. (Énfasis suplido.) 10 L.P.R.A. sec. 196.

Del texto transcrito resulta que en las *interferencias* el Departamento de Estado deberá decidir sobre la validez y suficiencia de las objeciones hechas a la inscripción por la parte adversa, si algunas, y la prioridad en el uso legítimo (incluso la buena fe) de la marca. 2 McCarthy, *op. cit.*, Sec. 20.25, págs. 1089–1093. En este caso la objeción de Colgate-Palmolive estuvo predicada en que ella utilizó la frase "Hace feliz a su nariz" antes que Mistolín la adhiriera a sus productos. El Departamento de Estado no otorgó valor alguno a este hecho irrefutable. Al así hacerlo, erró. La norma correcta la expone McCarthy:

[*E*]*l uso previo de un término en publicidad y promoción análogo al uso como marca de fábrica es suficiente para impedir la registración por un usuario subsecuente del mismo término o uno similar.* Por ejemplo, el uso previo de un tér-

mino en panfletos publicitarios, catálogos y anuncios en los periódicos, o en comunicados de prensa y publicaciones comerciales puede constituir un uso tan análogo al uso como marca de fábrica como para impedir la registración a un usuario subsecuente en un procedimiento de interferencia. Uso "análogo" a uso como marca de fábrica significa uso de tal naturaleza y extensión como para crear en la mente de los competidores una asociación entre el peticionario y sus productos. De acuerdo con la misma regla el uso previo del término como nombre comercial (*tradename*) o como marca sin significación secundaria dará prioridad en una interferencia. (Traducción nuestra.) Ibíd., Sec. 20.25, págs. 1091–1092.

■ La doctrina del "uso análogo" surgió a fines del siglo pasado como un imperativo circunstancial. Aspiraba a brindar protección a aquellos distintivos comerciales, que si bien no eran, *strictu sensu*, marcas de fábrica, ameritaban esa tutela jurídica bajo lo que hoy conocemos como competencia injusta (*unfair competition*). 1 Nims, *op. cit.*, Sec. 1, pág. 9; G. D. Cushing, *On Certain Cases Analogous to Trademarks*, 4 Harv. L. Rev. 321 (1891); 2 Nims, *op. cit.*, Sec. 230, pág. 794 n. 4; *John Wood Mfg. Co.* v. *Servel*, 77 F.2d 946 (C.C.P.A. 1935); *Touraine Co.* v. *F. B. Washburn Co.*, 286 F. 1020 (C.A.D.C. 1923); *The Atlas Underwear Company* v. *B. V. D. Company*, 9 T.M.R. 222 (1919); *M'Ilhenny Co.* v. *Trappey*, 277 F. 615 (C.A.D.C. 1922). Hoy en día está firmemente afianzada. *Walter Kide & Co.* v. *Alcon Laboratories, Inc.*, 162 U.S.P.Q. 412 (1969); *KMC Semiconductor* v. *Kevlin Mfg. Co.*, 153 U.S.P.Q. 683 (1967); *Sears Roebuck & Co.* v. *Mannington Mills, Inc.*, 138 U.S.P.Q. 261 (1963); *International Tel. & Tel. Corp.* v. *General Instruments Corp.*, 152 U.S.P.Q. 821 (1967). Sobre uso análogo: *Jim Dandy Company* v. *Martha White Foods, Inc.*, 458 F.2d 1397 (C.C.P.A. 1972); *American Components, Inc.* v. *Kent Corp.*, 160 U.S.P.Q. 335 (1968). Para una exposición más reciente de la

doctrina, consúltese *Caesars World, Inc.* v. *On-Line Systems, Inc.*, 209 U.S.P.Q. 334, 336–337 (1980).

En el caso de autos existen dos hechos determinantes no contradichos. Primero, que Colgate-Palmolive inició una amplia campaña publicitaria en la cual utilizó el "eslogan" "Fabuloso hace feliz a su nariz". Segundo, que después de esta gestión publicitaria, Mistolín comenzó a usar el referido "eslogan" en calidad de marca de fábrica. Desde la óptica doctrinaria expuesta resalta con claridad que Colgate-Palmolive estaba utilizando la frase en "forma análoga" a una marca de fábrica. Poco tiempo después es que Mistolín comienza a usarla. ([17])

■ Aparte de la aplicabilidad de la doctrina de "uso análogo", el Departamento de Estado debió evaluar la registración a favor de Mistolín fundado en la Sec. 4 (f) de la ley. En lo pertinente, dispone:

> *Tampoco se registrará una marca de fábrica que sea idéntica a otra marca ya inscrita o conocida* que pertenezca a otro y se use en artículos de las mismas propiedades descriptivas, o que tanto se asemeje a la marca de fábrica perteneciente a otro, *que sea muy probable que ocasione confusión o equivocación en la mente del público,* o dé lugar a engaño de los compradores; o que no haya sido usada legalmente en Puerto Rico por el solicitante o su antecesor, con anterioridad a la fecha de la presentación de la solicitud. 10 L.P.R.A. sec. 194.

■ Como podrá observarse, esta sección requiere que se deniegue la inscripción de una marca si existe *probabilidad* de confusión en la mente del público. Véanse: *Broderick* v. *L. Mitchell & Co.*, 289 F. 618 (Ct. App. D.C. 1923); *California Cyanide Co.* v. *American Cyanamid Co.*, 40 F.2d 1003

---

([17]) Debe recordarse que nuestro análisis está limitado a la conducta de las partes en Puerto Rico. No podemos otorgar relevancia jurídica al hecho —no cuestionado por Colgate-Palmolive— de que el "eslogan" fue ideado por Mistolín en Venezuela.

(C.C.P.A. 1930); *American Druggists' Syndicate* v. *United States Industrial Alcohol Co.*, 2 F.2d 942 (Ct. App. D.C. 1924). Sin prejuzgar la cuestión, es plausible que el tiempo y la extensión del uso publicitario de la frase por la Colgate-Palmolive pudiera haber creado en la mente del público una relación entre el "eslogan" y el producto Fabuloso. Debido a que el Departamento de Estado no formuló determinación específica al respecto, carecemos de elementos de juicio para considerar ese enfoque. Uno de los principales propósitos del registro de marcas es evitar la confusión sobre el origen de los productos en los compradores. *Keebler Co.* v. *Rovira Biscuit Corp.*, supra, pág. 372 n. 3. De configurarse esa confusión, procedía rechazar la solicitud de Mistolín.

■ En resumen, el Departamento de Estado erró al ordenar la inscripción a favor de Mistolín. El Tribunal Superior también erró al confirmar la decisión de dicho organismo. Contra las decisiones de la Oficina de Marcas del Departamento de Estado, los tribunales deben dictaminar no sólo la actuación registral de la agencia, sino también los derechos sustantivos de las partes. Este enfoque se impone como un imperativo de la economía procesal.

En el caso de autos, la sentencia recurrida limitó la controversia a cómo se adquiere una marca, y confirmó el dictamen bajo la doctrina de deferencia y especialidad del foro administrativo. La sentencia no cubrió ni se extendió a los aspectos de confusión real en la mente del público, competencia desleal y adquisición válida de la marca. La explicación radica en que la fragmentación de la controversia por la recurrente Colgate-Palmolive lo impidió. Por esta razón, en rigor para una buena metodología, nos hemos limitado al aspecto registral. Sin embargo, evidentemente la controversia es más amplia. Ambas partes deben tener la oportunidad, en su día, de pasar prueba adicional sobre los extremos aquí elaborados que no fueron considerados por la sentencia recurrida.

Por los fundamentos expuestos, *procede revocar la sentencia y que devolvamos el caso al tribunal de instancia para que consolidado con la causa PE-84-1305, continúen los trámites de rigor compatibles con lo aquí resuelto y se dilucide cuál de las partes tiene el mejor derecho sobre la frase.* (<sup>18</sup>)

*Se dictará la sentencia correspondiente.*

---

(18)Nuestros pronunciamientos de que Colgate-Palmolive utilizaba el "eslogan" en forma análoga al uso de una marca, no prejuzga la cuestión. Tan sólo podría producir efecto en cuanto a las limitaciones que la Sec. 4(f), 10 L.P.R.A. sec. 194(f), de la ley impone al Estado al admitir el registro de una marca.