EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Hazel Colón Vázquez y otros<br><br>Peticionarios<br><br>v.<br><br>José Daniel Báez Pérez y otros<br><br>Recurridos | Certiorari<br><br>2024 TSPR 104<br><br>214 DPR ___ |

Número del Caso: AC-2023-0005

Fecha: 24 de septiembre de 2024

Tribunal de Apelaciones:

Panel VII

Representante legal de la parte peticionaria:

Lcdo. Salvador M. Carrión Fonseca

Representantes legales de la parte recurrida:

Lcdo. Enrique J. Mendoza Méndez
Lcdo. Enrique J. Mendoza Sánchez

Materia: Derecho Corporativo y Derecho de Marcas – Proceder de los tribunales cuando se presenta una demanda al amparo del Art. 26 de la Ley de Marcas en la cual está involucrada una corporación disuelta que resultó ser dueña de la marca en controversia.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hazel Colón Vázquez y otros

    Peticionarios

        v.                      AC-2023-0005

José Daniel Báez Pérez y otros

    Recurridos

La Jueza Presidenta ORONOZ RODRÍGUEZ emitió la Opinión del Tribunal.

En San Juan, Puerto Rico, a 24 de septiembre de 2024.

En esta ocasión nos corresponde determinar cómo deben proceder los tribunales cuando se presenta una demanda al amparo del Art. 26 de la Ley de Marcas, *infra*, en la que está involucrada una corporación disuelta que resultó ser la dueña de la marca en controversia.

En vista de la situación particular que nos ocupa, y tras un análisis ponderado del expediente del recurso ante nos y de las normas legales aplicables, concluimos que lo que procede es la continuación de la vida jurídica de la corporación para los propósitos vislumbrados en el Art. 9.08 de la Ley de General de Corporaciones, *infra*. Habida cuenta de que la marca es considerada un activo,

corresponde su liquidación.

I

En el año 2015, los Sres. Jorge Antonio Rodríguez González (señor Rodríguez González) y José Daniel Báez Pérez (señor Báez Pérez) (en conjunto, "demandados-recurridos") comenzaron a utilizar la palabra *MECA* en el internet. En agosto de 2015, el señor Rodríguez González adquirió el dominio mecaartfair.com y para septiembre de 2015 realizó dos publicaciones con la etiqueta (*hashtag*) "MECA" en sus redes sociales personales. La primera publicación consistía en una fotografía publicada en la red social *Facebook*. En esta aparecían dos tarjetas con unas imágenes. El mensaje que acompañaba dicha publicación leía: "[t]amos ready! #zmaco2016 #materialartfair #Meca".[1] La segunda se publicó en su perfil personal en la red social *Instagram*. Consistía en una imagen acompañada del mensaje: "[a]lgo #heavyduty se está cuajando en el Caribe. Ansioso por anunciar este nuevo proyecto. Manténgase en sintonía [...] #MECA #ComingSoon2016".[2]

Así las cosas, en el 2016 los demandados-recurridos realizaron varias publicaciones sobre un *MECA Art Fair* en diferentes revistas. Las publicaciones expresaban que los demandados-recurridos, en conjunto con el Sr. Emil Medina y la Sra. Mariángel González, deseaban realizar una feria de arte llamada *MECA* del 24 al 28 de mayo de 2017. Además,

---

[1] Apéndice del *certiorari,* pág. 291.
[2] Íd., pág. 292.

expresaron que su concepto consistía en tener de diez (10) a doce (12) espacios alternativos de exhibición en sincronía con la feria y que "la finalidad principal de MECA [era] fungir como vía para exponer internacionalmente a artistas locales", y atraer de diez mil a quince mil asistentes.[3] Además, en diciembre de ese año se llevó a cabo un coctel para lanzar la marca *MECA Art* y promover una feria de arte que se llevaría a cabo en el 2017. Con esto en mente, los demandados-recurridos crearon una alianza con Desarrollo y Promoción Cultural, Inc. (DPC), quien proveería servicios financieros y *expertise* en industrias creativas.

A raíz de esto, el 10 de enero de 2017 se creó la compañía de responsabilidad limitada, Mercado Caribeño, L3C (Mercado Caribeño), con el propósito de producir y promover una feria de arte denominada *MECA International Art Fair*. Esta feria duraría cuatro días y consistiría en espacios de exhibición y promoción para galerías locales e internacionales. De igual manera, brindaría la oportunidad a artistas independientes de exponer y vender su arte. Como parte de la feria, habría, además, presentaciones musicales en vivo, entre otras ofertas culturales. Los miembros de esta entidad fueron los demandados-recurridos, la Sra. Hazel Colón Vázquez (señora Colón Vázquez), la Sra. María del Mar Frederique Guzmán (señora Frederique Guzmán) (en conjunto, "demandantes-peticionarias"), y la Sra. Mariángel Gonzáles

---

[3] Íd., pág. 645.

(señora Gonzáles).

El *Operating Agreement* (Acuerdo Operacional) estableció la manera concreta en la que se iban a distribuir la totalidad de las ganancias generadas por *MECA International Art Fair*. Además, dispuso expresamente que "ambas partes ac[ordaban] una participación representativa en la gobernanza del proyecto".[4] El Acuerdo Operacional no contenía disposiciones sobre la palabra o marca *MECA*, y Mercado Caribeño reembolsó al señor Rodríguez González lo que este pagó para adquirir el dominio *mecaartfair.com*.

El 21 de enero de 2017 Mercado Caribeño lanzó la primera convocatoria del *MECA International Art Fair*. Mercado Caribeño organizó y llevó a cabo ediciones del *MECA International Art Fair* durante los años 2017, 2018 y 2019. Sin embargo, en el 2020 se detuvo la celebración del evento a causa de la pandemia del COVID-19.

Posteriormente, el 17 de diciembre de 2021 los miembros de Mercado Caribeño acordaron disolver la entidad debido a conflictos internos. Los activos se distribuyeron de acuerdo con el porcentaje de participación de cada miembro de la corporación. Se discutió, además, la posibilidad de crear una nueva entidad con otra estructura corporativa. Nada se dispuso sobre el futuro de la marca *MECA*.

El 15 de febrero de 2022 el señor Báez Pérez presentó una solicitud de registro de la palabra *MECA* ante el *United*

---

[4] Apéndice del *certiorari*, pág. 310.

*States Patent and Trademark Office* (en adelante, "USPTO"). En esta, alegó ser el único dueño de la marca. Asimismo, identificó el 1 de mayo de 2017 como la fecha de primer uso de la marca.[5]

El 10 de marzo de 2022 los demandados-recurridos anunciaron el regreso de *MECA International Art Fair* mediante una publicación en las redes sociales de *MECA*. Aseguraron que *MECA* volvería del 10 al 13 de noviembre de 2022 y expresaron: "Después de dos años de ausencia involuntaria [,] nos emociona y alegra anunciar el regreso de la feria internacional de arte *MECA* en su cuarta edición a realizarse en el mítico Antiguo Arsenal de la Marina Española en el Viejo San Juan".[6]

Ante esto, el 29 de abril de 2022 las demandantes-peticionarias presentaron en el Tribunal de Primera Instancia una *Demanda* sobre violación de derechos marcarios, incumplimiento de contrato, daños y perjuicios, e interdicto preliminar y permanente, al amparo del Art. 26 de la *Ley de Marcas del Gobierno de Puerto Rico*, Ley Núm. 169-2009, según enmendada, 10 LPRA sec. 223w (Ley de Marcas), en contra de los demandados-recurridos.

Las demandantes-peticionarias alegaron que los demandados-recurridos utilizaron la marca *MECA* sin su consentimiento. Explicaron que Mercado Caribeño era la dueña

---

5 Apéndice del *certiorari*, pág. 518. Resaltamos que el señor Báez Pérez y el señor Rodríguez González, mediante una *Moción Aclaratoria* de 18 de mayo de 2021, aclararon que, a pesar de que la solicitud se presentó ante USPTO, a esa fecha no había sido aprobada.
6 Apéndice del *certiorari*, pág. 169.

exclusiva de la marca *MECA* y que, en consecuencia, los demandados-recurridos no tenían derecho a utilizarla sin el consentimiento y participación de las demandantes-peticionarias. Fundamentaron su postura en que, tras la disolución de Mercado Caribeño, sus socios ostentaban un derecho propietario en comunidad sobre la marca *MECA*.

Al respecto, las demandantes-peticionarias sostuvieron que, previo a que se incorporara Mercado Caribeño, no se habían prestado los servicios que iban a rendirse con la marca *MECA*, a saber: (1) celebrar una feria de arte en la cual artistas y galerías alquilaran espacios para exponer sus piezas y (2) vender boletos de entrada a dicha actividad al público general. Enfatizaron que los actos de planificación previos a que se creara Mercado Caribeño no eran suficientes para constituir un uso en el comercio que diera base a un derecho propietario exclusivo sobre la marca.

Mientras, el 16 de mayo de 2022 los demandados-recurridos presentaron una *Moción en cumplimiento de orden y solicitud de desestimación* por falta de legitimación activa. Alegaron que registrar una marca no era indicativo de que quien la registrara era el dueño y que la propiedad sobre la marca se obtenía por el uso y no por su registro. Añadieron que era doctrina establecida por este Tribunal en Colgate-Palmolive v. Mistolín, 117 DPR 313 (1986), que el derecho propietario le pertenecía a quien primero utilizara el nombre en conexión con el producto o servicio en la jurisdicción que ofrecía la protección jurídica. Indicaron

ser los únicos dueños de la marca *MECA* ya que la habían utilizado en el comercio de manera continua y deliberada desde el año 2014. Insistieron que, si bien era cierto que la primera feria de arte *MECA* había ocurrido en el 2017, ellos estuvieron años desarrollando la feria de arte y coordinando la colaboración de galerías internacionales y artistas de calibre mundial por lo que, desde el 2014, habían establecido la marca mediante su uso y existía un reconocimiento internacional de la marca *MECA* por la comunidad artística. Sostuvieron que las demandantes-peticionarias no tenían legitimación activa para presentar la referida demanda ya que nunca habían tenido y no tenían derecho propietario sobre la marca *MECA*.

Los demandados-recurridos arguyeron, también, que como únicos propietarios del derecho de uso exclusivo de la marca *MECA*, nunca la transfirieron a Mercado Caribeño. Añadieron que en el Acuerdo Operacional de Mercado Caribeño no se hacía mención alguna de la cesión de derechos sobre la marca *MECA*. Así las cosas, solicitaron la desestimación de la demanda en su contra.

El 18 de mayo de 2022 las demandantes-peticionarias presentaron una *Moción en oposición a solicitud de desestimación* mediante la cual alegaron que los demandados-recurridos no habían logrado probar un uso suficiente de la marca para establecer prioridad sobre esta. Alegaron que, previo a Mercado Caribeño, no existía un uso *bona fide* en el mercado de la marca *MECA*, según requería tanto la Ley de

Marcas, *supra*, como la jurisprudencia local y federal aplicable. Según las demandantes-peticionarias, no se había provisto servicio alguno con la marca *MECA* previo a la existencia de Mercado Caribeño.

Las demandantes-peticionarias argumentaron que la mera creación de un concepto, una idea, un nombre o símbolo, no creaba derechos marcarios ya que era mediante el uso en el comercio de una marca que nacía ese derecho. Por lo tanto, eran del criterio que los demandados-recurridos nunca fueron dueños de la marca ya que esta no existía previo a los actos y la actividad comercial que realizó Mercado Caribeño para el *MECA International Art Fair*. Puntualizaron que *MECA* adquirió su distinción en la mente de los consumidores mediante la celebración anual de la feria y de otras actividades culturales. Insistieron que el público asociaba dichos eventos de la marca con Mercado Caribeño, y no con los demandados-recurridos en su carácter individual.

Tras varios trámites procesales, el 9 y 15 de junio de 2022 se celebró una vista evidenciaria sobre interdicto preliminar. El 12 de septiembre de 2022 el Tribunal de Primera Instancia notificó una *Sentencia Parcial* mediante la cual desestimó la reclamación de derechos marcarios por falta de legitimación activa. Resolvió que los demandados-recurridos crearon la marca *MECA*, y que las demandantes-peticionarias no habían demostrado que los derechos de la marca fueran transferidos a Mercado Caribeño. En específico,

el foro primario determinó que la idea de *MECA* fue originalmente de los demandados-recurridos.

El Tribunal de Primera Instancia explicó que al constituirse la corporación Mercado Caribeño, no existía ningún documento oficial o contrato del cual surgiera el traspaso de la marca. Explicó que en la disolución de Mercado Caribeño nada se estableció sobre la división de la marca, puesto que esta no era parte del patrimonio de la corporación, sino de los demandados-recurridos. El 27 de septiembre de 2022, las demandantes-peticionarias presentaron una *Moción de reconsideración y determinaciones de hechos adicionales*. Esta se denegó mediante una *Resolución* notificada el 28 de septiembre de 2022.

El 28 de octubre de 2022 las demandantes-peticionarias presentaron un recurso de apelación ante el Tribunal de Apelaciones. Arguyeron que el foro primario erró al concluir que los demandados-recurridos crearon la marca antes de la creación de Mercado Caribeño o, en la alternativa, que no habían transferido los derechos marcarios a la compañía.

El 19 de diciembre de 2022, el Tribunal de Apelaciones confirmó mediante una *Sentencia* el dictamen recurrido. Razonó que las demandantes-peticionarias no habían logrado demostrar que fueron las primeras en utilizar la marca o que se hubiera concretado un acuerdo para comprar los derechos de marca. El 3 de enero de 2023, las demandantes-peticionarias presentaron una *Moción de reconsideración*, la cual el foro apelativo intermedio denegó mediante una

*Resolución* emitida el 10 de enero de 2023 y notificada el 11 de enero de 2023.

Insatisfechas, el 10 de febrero de 2023 las demandantes-peticionarias recurrieron ante este Tribunal mediante un recurso de apelación *y* señalaron los errores siguientes:

> Erró el Tribunal de Apelaciones al confirmar que los apelados no habían cedido sus derechos sobre la marca *MECA* al incorporarse la entidad a la cual cedieron la representación y gobernanza del proyecto y bajo la cual se llevaban a cabo todos los negocios relacionados a dicha marca.
>
> Erró el Tribunal de Apelaciones al aplicar la doctrina de "uso análogo" en un caso donde no existe una disputa entre usuarios rivales de una marca, así como al no aplicar los requisitos que exige dicha doctrina para determinar su procedencia.

Tras acoger el recurso como un *certiorari*, ambas partes presentaron sus alegatos. Con el beneficio de sus comparecencias, resolvemos.

## II

### A. Ley de Marcas

La Ley de Marcas tiene como propósito regular y salvaguardar los derechos de los dueños de marcas, así como de los consumidores. Exposición de Motivos de la Ley Núm. 169 (2009 Leyes de Puerto Rico 1447). Esto es así mediante la construcción de un esquema regulatorio que dicta la pautas mediante las cuales se adjudicará y administrará la titularidad sobre un derecho marcario. Este estatuto integra elementos de la derogada Ley Núm. 63 de 14 de agosto de 1991, también conocida como *Ley de Marcas de Puerto Rico*; del U.S.

Trademark Act, 15 USCA 1051 *et seq.*, también conocido como el *Lanham Act*, y el *Model State Trademark Act*. Exposición de motivos de la Ley Núm.169-2009, *supra*. De esta forma, el derecho marcario en Puerto Rico se rige por derecho estatal y federal. Así, "[la legislatura] ha admitido en Puerto Rico el sistema marcario norteamericano". Colgate-Palmolive v. Mistolin, *supra*, pág. 323 (*citando a* Garriga Trad. Co., Inc. v. Century Pack. Corp., 107 DPR 519, 522 (1978)).

No obstante, cabe resaltar que "los usos y costumbres comerciales [derivados del] Art. 2 del Código de Comercio, la protección que otorga nuestro ordenamiento a la propiedad en general", y la teoría de la competencia ilícita y la equidad, también influencian los principios del derecho de marcas en Puerto Rico. Colgate-Palmolive v. Mistolin, *supra*, págs. 322-323; Código de Comercio de Puerto Rico de 1932, 10 LPRA sec. 1002 (1932). Ahora bien, "cuando en virtud de una ley estatal se contraviene una disposición del *Lanham Act*, opera una ocupación parcial del campo y se invalida el efecto de la disposición estatal que conflige con los preceptos de la [ley federal]". Arribas v. Am. Home, 165 DPR 598, 611 (2005).

### B. Plusvalía e indivisibilidad de la marca

Los derechos sobre una marca permiten que una persona comerciante pueda diferenciar de manera exclusiva su producto o servicio de otros, añadiendo valor a su negocio para propósitos de reputación y reconocimiento. Posadas de PR v. Sands Hotel, 131 DPR 21, 33 (1992); Colgate-Palmolive

v. Mistolin, *supra*, pág. 321. Además, evita la confusión del consumidor al momento de seleccionar el producto o servicio de su gusto ya que el origen del producto apunta a su calidad e individualidad. Colgate-Palmolive v. Mistolin, *supra*, pág. 332. Es por esto que el tratadista J. Thomas McCarthy explica que el reconocimiento de más de un dueño de una marca es contrario al principio del derecho marcario. En consecuencia, una marca no puede ser dividida y repartida entre entidades independientes. 2 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, secs. 2:15 y 16:40 (2023).

La plusvalía o *goodwill* de un negocio se define como la reputación o buen nombre de una empresa, bien o servicio frente a terceros. También, como el prestigio que tiene un establecimiento de comercio o una persona comerciante frente al público en general. Posadas de PR v. Sands Hotel, *supra*, pág. 36. Históricamente, el derecho marcario está atado íntimamente a los preceptos comerciales ya que la protección jurídica que este derecho otorga sobre una marca se instituyó para la protección de la plusvalía de las distintas industrias y los negocios particulares que componen cada una. Park 'N Fly, Inc. v. Dollar Park & Fly, Inc., 469 U.S. 189, 198 (1985).

McCarthy, incluso, ha definido una marca como un mero símbolo que representa una plusvalía existente. 2 McCarthy, *supra*. Así, una marca no existe hasta que tenga algo que representar, y será la existencia de un negocio y de su

plusvalía la que le otorgue un valor distintivo a esa palabra, nombre, símbolo, imagen o estilo comerciales, medio, logo, diseño, color, sonido, olor, forma, objeto o una combinación de estos, que comenzaremos a asociar directamente con ese negocio y los productos o los servicios que ofrezca. 2 McCarthy, *supra*. En consecuencia, el derecho marcario "persigue resguardar la reputación, plusvalía, así como la calidad que la marca haya desarrollado". Bedrosian Heres v. Nestle Purina Petcare, 205 DPR 1117, 1130 (2020) (*citando a* Arribas v. American Home, *supra*, pág. 605; Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., *supra*, pág. 198).

### i.  Registro de marcas y uso comercial

El requisito del uso de la marca en el comercio hace referencia al uso legal de buena fe de esta y el cumplimiento con este requisito varía según la categoría de marca. Bedrosian Heres v. Nestle Purina Petcare, *supra*, pág. 1131. El uso de buena fe de una marca significa que esta fue utilizada con la intención legítima de vender un producto o rendir un servicio en el mercado, y no meramente para reclamar derechos sobre esta en un futuro. Íd.

Además, el uso en el comercio debe ser continuo, en otras palabras, seguido de actividades que demuestren un esfuerzo no esporádico de vender un producto o rendir un servicio al momento o actividades que demuestren la intención de hacerlo en el futuro. Chance v. Pac-Tel Teletrac Inc., 242 F.3d 1151, 1157 (9no Cir. 2001); Avakoff v. S. Pac. Co., 765 F.2d 1097, 1098 (Fed.Cir.1985); 2 McCarthy,

*supra*. Por tanto, el uso comercial de una marca se reduce a dos elementos: (1) el uso de la alegada marca fue de buena fe y (2) si fue seguido por actividades que demostraron un esfuerzo continuo de utilizar la marca en el contexto de la venta de un producto o el rendimiento de un servicio. Chance v. Pac-Tel Teletrac Inc., *supra*, pág. 1157 (*citando a* Avakoff v. S. Pac. Co., *supra*, pág. 1098).

Este uso no se demuestra mediante meras gestiones de planificación o promoción. Para poder demostrar el uso el servicio o producto representado por la marca debe existir:

> El término "uso en el comercio" **significa que la marca se utilizó de buena fe**, y que dicho uso no se realizó con la mera intención de reservar derechos sobre la marca. Para propósitos de este capítulo, una marca se considerará utilizada en el comercio--
> .    .    .    .    .    .    .    .
> **(2) en servicios cuando es utilizada o desplegada en la venta o promoción de servicios y dichos servicios se prestan en el comercio,** o los servicios son prestados en más de un estado o en los Estados Unidos y en un país del extranjero y la persona que presta los servicios está involucrada en el comercio en conexión con los servicios.[7] (Traducción y negrillas suplidas) 15 USCA sec. 1127.

"El interés adquirido sobre una marca es un derecho propietario". Colgate-Palmolive v. Mistolin, *supra*, pág. 322. Ahora bien, en Puerto Rico, aquella persona que registre válidamente su marca ante el *Puerto Rico Trademark Office* (PRTO) será acreedor de un reconocimiento de su derecho propietario sobre esa marca. 10 LPRA sec. 223a. En

---

[7] Texto original en inglés: The term "use in commerce" means the bona fide **use of a mark in the ordinary course of trade,** and not made merely to reserve a right in a mark. For purposes of this chapter, a mark shall be deemed to be in use in commerce--
.    .    .    .    .    .    .    .
**(2) on services when it is used or displayed in the sale or advertising of services and the services are rendered in commerce,** or the services are rendered in more than one State or in the United States and a foreign country and the person rendering the services is engaged in commerce in connection with the services.

atención a esto, "el Certificado de Registro expedido por el Secretario de Estado será 'evidencia *prima facie* de la validez de la marca'". Bedrosian Heres v. Nestle Purina Petcare, *supra*, pág. 1132 (*citando* la Ley de Marcas, 10 LPRA sec. 223j).

No obstante, ese derecho "sucumbirá ante la reclamación oportuna por parte de quien tiene mejor derecho sobre la marca por haberla usado con anterioridad". Arribas v. Am. Home, *supra*, pág. 605. Esto se debe a que:

> El criterio rector para que una marca alcance protección jurídica **es su uso en determinado mercado y jurisdicción en conexión con el producto o servicio**. En virtud de esto, la falta de inscripción de una marca en uso no es óbice para que se le reconozcan derechos propietarios sobre ésta a la persona natural o jurídica que la haya impulsado. Bedrosian Heres v. Nestle Purina Petcare, *supra*, págs. 1131-1132 (*citando a* Colgate-Palmolive v. Mistolín, *supra*, pág. 325) (Negrilla suplida).

Cónsono con ello, al analizar nuestra Ley de Marcas, hemos postulado que:

> [E]se derecho propietario solo será posible si no hay un usuario previo de esa misma marca. En caso de haber un usuario previo, este tendrá mejor derecho sobre la marca. Incluso, su mera presencia debe imposibilitar el registro de la marca a nombre de otro, siempre que exista una probabilidad de confusión. Arribas v. American Home, *supra*, pág. 606.

En síntesis, el uso comercial para propósitos del *Lanham Act* y la Ley de Marcas, se define como el uso de la marca en productos o servicios que estén disponibles a la hora de promocionarse. El demostrar la intención de utilizar una marca mediante gestiones no crea un derecho de uso exclusivo sobre esta.

En Am. Express Co. v. Goetz, 515 F.3d 156 (2d Cir. 2008), al enfrentarse a una controversia similar al caso que

nos ocupa, el Segundo Circuito de Cortes de Apelaciones (Segundo Circuito) entendió que presentar una idea o concepto para generar interés entre posibles consumidores o participantes no constituía el uso necesario para conceder protección a la marca ya que esta no identificaba el origen de productos o servicios. ("A mark that does not perform the role of identifying a source is not a trademark"). Íd., pág. 159.[8]

En ese caso, el Segundo Circuito entendió que no puede haber marca de servicio si los servicios son inexistentes. ("The right to exclusive use of a trademark derives from its appropriation and subsequent use in the marketplace; thus, there can be no trademark absent goods sold and no service mark without services rendered"). Íd., pág. 161. ("It cannot be said that a service mark is actually used if it is displayed in an advertisement for services that are non-existent or will only hypothetically be available at some point in the future."). Íd.

Ahora bien, tanto el *Lanham Act* como la Ley de Marcas reconocen el registro basado en *intent-to-use* (ITU) o intención *bona fide*. El Lanham Act establece que cualquier persona con la intención *bona fide* y bajo circunstancias que

---

[8] En <u>Am. Express Co. v. Goetz</u>, *supra* pág. 161, el Segundo Circuito indicó que: "In sum, Goetz employed the slogan My Life, My Card to generate interest among potential licensee credit card companies and not to differentiate or identify the origin of his goods or services. In such circumstances, the slogan served as "a mere advertisement for itself as a hypothetical commodity."

demuestren su buena fe de utilizar una marca en el comercio podrá "solicitar el registro de su marca mediante el pago de la tarifa correspondiente y la presentación de su solicitud junto con una declaración verificada, ante la oficina de marcas y patentes, de la manera que establezca su director".[9] 15 USCA sec. 1051. Mientras que el Art. 3 de la Ley de Marcas establece que "[e]l derecho sobre una marca se adquiere por: 1) el uso de la marca en el comercio; o 2) por el registro de la misma basado en la intención bona fide de utilizar la marca en el comercio". 10 LPRA sec. 223a.

El registro basado en ITU se solicita previo a que se utilice la marca en el comercio, pero deben existir preparativos para utilizar la marca en el mercado prontamente. Zobmondo Entertainment, LLC v. Falls Media, LLC, 602 F.3d 1108, 1111, n.3, 94 USPQ 2d 1491 (9th Cir. 2010). Esto funciona como un tipo de reserva de derechos sobre esa marca. Esta reserva se convertirá en un registro cuando se pruebe ante el USPTO que el ITU se solicitó con la intención de utilizar la marca de buena fe y que, en efecto, esta se ha utilizado en el mercado. Esto se demuestra mediante la presentación de un *Allegation of Use* (AOU) o un *Statement of Use* (SOU). En ese momento la fecha de registro se retrotraerá a la fecha del primer uso de la marca en el

---

[9] Texto original en inglés: "The owner of a trademark used in commerce may request registration of its trademark on the principal register hereby established by paying the prescribed fee and filing in the Patent and Trademark Office an application and a verified statement, in such form as may be prescribed by the Director, and such number of specimens or facsimiles of the mark as used as may be required by the Director."

mercado. Humanoids Group v. Rogan, 375 F.3d 301, 305, n.3, 71 USPQ 2d 1745 (4th Cir. 2004) (*citando a* Allard Enterprises, Inc. v. Advanced Programming Resources, Inc., 249 F.3d 564, 572, 58 USPQ 2d 1710 (6th Cir. 2001)).

Ahora bien, ausente este tipo de registro, es improcedente reclamar derechos de uso exclusivo sobre una marca cuando el uso que se le dio fue con la intención de reservarla o de reclamar derechos sobre ella en el futuro. Esto es conocido como *token use* y se define como utilizar una palabra, frase o cualquier otra cosa similar a una marca sin intenciones reales de llevar a cabo o prepararse para llevar a cabo una venta real de un producto o el ofrecimiento de un servicio. Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha, 754 F.2d 591, 601 (5th Cir. 1985). El *token use* se utiliza con el propósito de intentar reservar una marca hasta que exista un producto o servicio para atarla a ella.[10] Ralston Purina Co. v. On-Cor Frozen Foods, Inc., 746 F.2d 801, 804 (Fed. Cir. 1984) (*citando a* Gay Toys, Inc. v. McDonald's Corp., 585 F.2d 1067, 199 USPQ 722 (CCPA 1978));

---

[10] Reseñamos, como fuentes persuasivas, algunas decisiones de las Cortes de Circuito de los Estados Unidos y decisiones de los foros administrativos, específicamente del Trademark Trial and Appeal Board (TTAB) del USPTO por su peritaje en esta materia. Algunos ejemplos de *token use* son los siguientes: En Times Mirror Magazines, Inc. v. Sutcliffe, 205 USPQ 656 (TTAB 1979) la alegada marca estaba atada a una revista mensual, no obstante, nunca se encontró evidencia registrada de que se publicara una revista en ese momento. En Gay Toys, Inc. v. McDonald's Corp., 585 F.2d 1067, 199 USPQ 722 (CCPA 1978), el solicitante afirmó el uso de BIG MAC para camiones de juguete, pero no existían tales camiones de juguete, solo una maqueta de yeso. Por último, en CPC International, Inc. v. The Seven-Up Co., 218 USPQ 379 (TTAB 1983), el TTAB del USPTO concluyó que el solicitante no tenía planes definidos ni en el momento del envío simbólico de bienes ni en el momento del juicio para continuar usando la marca en cuestión en relación con un producto específico.

CPC International, Inc. v. The Seven-Up Co., 218 USPQ 379 (TTAB 1983); PRF Corp. v. Acme Quilting Co., 218 USPQ 276 (TTAP 1982); Richardson-Vicks, Inc. v. Franklin Mint Corp., 216 USPQ 989 (TTAB 1982); and Times Mirror Magazines, Inc. v. Sutcliffe, 205 USPQ 656 (TTAB 1979)). Es importante mencionar que, previo al 1989, el *token use* era suficiente para fundamentar el registro de una marca. Blue Bell, Inc. v. Farah Mfg. Co., 508 F.2d 1260, 1266 (5th Cir. 1975).

### *C. La corporación y los efectos de su disolución*

La *Ley General de Corporaciones de Puerto Rico*, Ley Núm. 164-2009, según enmendada, 14 LPRA sec. 3501 *et seq.* (Ley General de Corporaciones), es el estatuto que rige la existencia y vida jurídica de las corporaciones privadas en nuestra jurisdicción. Eagle Sec. Police, Inc. v. Dorado, 2023 TSPR 5, 9; Dorado del Mar v. Weber, et als., 203 DPR 31, 45 (2019) (*citando a* DACo v. Alturas Fl. Dev. Corp., y otro, 132 DPR 905, 915 (1993)).

Una vez emitido su certificado de incorporación, la corporación adquiere personalidad jurídica propia y una serie de facultades entre las cuales se encuentran:

> [C]omprar, recibir, poseer, arrendar, adquirir o ceder, en cualquier modo o forma, bienes muebles o inmuebles o cualquier otro interés en los mismos, dondequiera que estén sitos, y **vender, arrendar, permutar o en cualquier otra forma transferir o gravar, total o parcialmente, su propiedad y activos, o cualquier interés en los mismos, dondequiera que estén sitos**. (Negrilla suplida) 14 LPRA sec. 3505 & 3522.

Al interpretar dicha disposición, este Tribunal ha expresado que "tan pronto ostenta personalidad jurídica y, por ende, legitimación activa, [la corporación] puede

otorgar contratos y comparecer a una acción civil como demandante o demandada bajo su nombre corporativo y/o participar en cualquier procedimiento civil, administrativo, de arbitraje o de cualquier otro género. Íd., sec. 3522; Eagle Sec. Police, Inc. v. Dorado, *supra*, pág. 10. Esta personalidad jurídica es distinta y separada de sus dueños. Santiago v. Rodríguez, 181 DPR 204 (2011). La existencia de la personalidad jurídica se retrotrae al momento de presentación del documento de incorporación ante el Departamento de Estado. Eagle Sec. Police, Inc. v. Dorado, *supra*, pág. 9.

Es en virtud de esta personalidad jurídica, y de las facultades conferidas por el Art. 2.02 de la Ley, que las corporaciones pueden ostentar la titularidad sobre una marca como lo harían sobre otros tipos de bienes apropiables.[11] De esta forma, la marca se entiende como un activo de la corporación que puede ser manejado como tal.

---

[11] Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 US 251, 259 (1916) ("The right to use a trademark is recognized as a kind of property, of which the owner is entitled to the exclusive enjoyment to the extent that it has been actually used."); Beech-Nut Packing Co. v. P. Lorillard Co., 273 US 629, 632 (1927) ( "[I]n a qualified sense the mark is property, protected and alienable, although as with other property its outline is shown only by the law of torts,…"); Jacob Siegel Co. v. Federal Trade Commission, 327 US 608, 612 (1946)("[W]e are dealing here with trade names which … are valuable business assets."); Posadas de P.R. v. Sands Hotel, *supra* pags. 36-37 citando a Hanover Star Milling Co. v. Metcalf, 240 US 403, 413 (1916) ("[T]rade-marks, and the right to their exclusive use, are of course to be classed among property rights ... but only in sense that a man's right to the continued enjoyment of his trade reputation and good-will that flows from it, free from unwarranted interference by others, is a property right, for the protection of which a trade-mark is an instrumentality"). Hanover fue reemplazado por el Lanham Act, según establecido en el caso Park 'N Fly, Inc. v. Dollar Park and Fly, Inc., *supra*. La derogación se limita a las determinaciones incompatibles con el Lanham Act.

En lo pertinente al caso ante nuestra consideración, el Art. 9.08 de la Ley General de Corporaciones provee para la subsistencia de una corporación disuelta. De manera específica, establece que:

> Toda corporación que se extinga por limitación propia o que por otro modo se disuelva, continuará como cuerpo corporativo por un plazo de tres (3) años a partir de la fecha de extinción o de disolución o por cualquier plazo mayor que el Tribunal de Primera Instancia (Sala Superior) en el ejercicio de su discreción disponga a los efectos de llevar adelante los pleitos entablados por la corporación y de proseguir con la defensa de los pleitos entablados contra ella, ya sean civiles, criminales o administrativos, **así como a los efectos de liquidar y terminar el negocio, de cumplir con sus obligaciones y de distribuir a los accionistas los activos restantes.** No podrá continuar la personalidad jurídica con el propósito de continuar los negocios para los cuales se creó dicha corporación. (Negrillas suplidas) 14 LPRA sec. 3708.

Por su parte, el Art. 9.09 de la Ley General de Corporaciones provee para que ante la disolución de una corporación, el Tribunal de Primera Instancia nombre un síndico o administrador judicial para que este se haga cargo del patrimonio de la corporación para, entre otras cosas, realizar la liquidación final de los asuntos corporativos pendientes. De manera específica, el referido Artículo indica que:

> Cuando se disolviere alguna corporación con arreglo a las disposiciones de esta Ley, **el Tribunal de Primera Instancia (Sala Superior), en cualquier momento** y a petición de cualquier acreedor o de cualquier accionista o director de la corporación, o a petición de cualquiera que a juicio del Tribunal muestre justa causa para ello, **podrá nombrar como síndico** a uno o a varios de los directores de la corporación **o designar administrador judicial a una o más personas, en representación de y para beneficio de la corporación, para que tales administradores judiciales o síndicos se hagan cargo del patrimonio de la corporación** y cobren los créditos y recobren los bienes de la corporación con poder de demandar y defender, a nombre de la corporación, para entablar todos los litigios que sean necesarios para los propósitos antes expuestos, y para nombrar agente o agentes bajo sus órdenes **y para ejecutar todos los actos que la corporación realizaría, si existiera y que sean necesarios para la liquidación final de los asuntos corporativos pendientes. Las facultades de los administradores judiciales y los**

**síndicos podrán prorrogarse por el tiempo que el Tribunal
de Primera Instancia (Sala Superior) estime necesario para
los fines antes mencionados.** (Negrillas suplidas) 14 LPRA
sec. 3709.

El Art. 9.09 de la Ley General de Corporaciones, *supra*,
proviene de la Sec. 279 de la Ley General de Corporaciones
de Delaware, 8 Del. C. Sec. 279. Esta sección busca
"salvaguardar el recobro y la administración de los aun
existentes derechos propietarios de la corporación disuelta
una vez transcurre el plazo de tres años después de la
disolución".[12] 3 *Folk on the Delaware General Corporation
Law* Sec. 279.01 (2017).

Al activarse este procedimiento, todos los bienes de la
corporación disuelta pasan a formar parte de un fideicomiso.
El síndico o el administrador judicial como representante de
la corporación será el encargado del fideicomiso. Miramar
Marine v. Citi Walk, 198 DPR 684, 697 (2017) (*citando a Folk*,
*supra*, pág. 122). Así, deberá velar por los bienes que estén
en el fideicomiso y administrarlos para beneficio de los
accionistas y de los acreedores. Miramar Marine v. Citi Walk,
*supra*, pág. 697; C. Díaz Olivo, *Corporaciones: tratado sobre
derecho corporativo*, Colombia, [s. Ed.], 2016, pág. 385. Al
ejercer sus funciones deberá actuar con el juicio y la
diligencia que observaría cualquier persona en su misma
posición. Miramar Marine v. Citi Walk, *supra*, pág. 697; Díaz
Olivo, *op. cit.*, pág. 385.

---

[12] Texto original en inglés: "[t]o safe guard the collection and
administration of the still-existing property interests of a dissolved
corporation once the three-year period after the dissolution prescribed
[...]"

Cabe destacar que la corporación objeto de la controversia que este Tribunal analizó en Miramar Marine v. City Walk, *supra*, intentó instar un pleito judicial para cobrar una acreencia ya transcurrido el periodo de subsistencia de tres (3) años reconocido en el Art. 9.08 de la Ley General de Corporaciones, *supra*. En vista de esto, este Tribunal determinó que transcurrido el referido periodo "el único remedio que existe para liquidar cualquier propiedad que aún posea la corporación, es el procedimiento dispuesto en el Art. 9.09 de nuestra Ley General de Corporaciones, *supra.* Miramar Marine v. Citi Walk, *supra*, págs. 697-698.

No obstante, como señalamos anteriormente, el lenguaje del Art. 9.09 de la Ley General de Corporaciones, *supra*, provee para el nombramiento de un síndico o administrador judicial. Asimismo, los tribunales de Delaware, al aplicar la Sec. 279 de la Ley General de Corporaciones de Delaware, *supra*, han reconocido la facultad de los tribunales de nombrar un síndico o administrador judicial aun cuando la corporación esté activa o no haya transcurrido el periodo de tres (3) años desde su disolución.[13]

---

[13] Véase Campbell v. Pennsylvania Indus., 99 F. Supp. 199, 205 (1951):

> Among other situations which may warrant or require a court of equity to appoint a receiver to liquidate a solvent corporation is a deadlock between contending factions seeking to control and manage a corporation, abandonment of corporate functions, failure of corporate purposes, and gross fraud and mismanagement on the part of directors and controlling stockholders involving a breach on their part

**i. La marca como activo de una corporación disuelta**

Debido a que una marca se presume inseparable de la plusvalía de un negocio por haber logrado crear determinada expectativa o reputación en la mente de los consumidores, la Corte Suprema de los Estados Unidos ha admitido que existe amplia confusión con respecto a la transferibilidad de una marca entre individuos y corporaciones. K Mart Corp. v. Cartier, Inc., 486 US 281, 313-314 (1988) (*citando a* Grismore, The Assignment of Trademarks and Trade Names, 30 Mich.L.Rev. 490, 491 (1932)).[14]

Este Tribunal en Miramar Marine v. Citi Walk, *supra*, estableció que es erróneo "ver a los accionistas de una corporación disuelta como los herederos de los activos y

---

of the fiduciary or quasi-fiduciary duty owed to minority stockholders.

Véase, también, In re Krafft-Murphy, Co., Inc., 82 A.3d 696, 704 (2013):

Under § 279, the Court of Chancery may appoint a receiver, at any time, to: (i) "take charge of the corporation's property," (ii) "collect the debts and property due and belonging to the corporation," (iii) "appoint an agent or agents," and (iv) "do all other acts ... necessary for the final settlement of the unfinished business of the corporation." Thus, § 279 enumerates the purposes for which a receiver may be appointed, which include administering the "still existing property interests of a dissolved corporation."

[14] No obstante, actualmente se permite la transferencia de una marca. La Ley de Marcas específicamente indica que:

Toda marca registrada o solicitud de registro de marca puede ser transferida; disponiéndose que dicho traspaso no afectará el término de vigencia del registro establecido en esta Ley. Tal traspaso deberá hacerse por medio de un documento cumpliendo con los requisitos que establezca el Secretario mediante reglamento. El Secretario anotará en el Registro el traspaso y expedirá el correspondiente certificado. Art. 10, Ley de Marcas, *supra*, 10 LPRA sec. 223h.

pasivos de la entidad". Íd., pág. 685. Esto es así ya que, al morir una persona natural, opera una sucesión civil sin personalidad jurídica propia. Íd. De esta forma, la propiedad no adjudicada al disolverse la corporación no se distribuye entre sus socios de manera proporcional a sus participaciones, **sino que permanecen bajo la titularidad de la corporación.**

Al existir un elemento de inseparabilidad entre la marca y el producto o servicio, enfrentamos ciertas dificultades cuando se disuelve la entidad y se dividen sus activos y pasivos entre las personas inversionistas, socias o dueñas. KMart Corp. v. Cartier, Inc., 486 US 281 (1988); Grismore, *supra*. Durante la disolución de una corporación procede la división y distribución de los activos y pasivos conforme al porciento de participación que cada uno ostentaba sobre la entidad conforme a los preceptos de nuestro Código Civil y del derecho corporativo. Véase: Art. 849 del Código Civil de 2020, 31 LPRA sec. 8222; *Ley General de Corporaciones*, 14 LPRA secs. 3701-3715.

No obstante, y en lo pertinente, si cada persona inversionista, socia o dueña, recibiera la porción del derecho a la marca que le corresponde conforme a su interés en el negocio, el valor de la marca se fragmentaría y cada uno la usaría para representar algo distinto a lo que la marca simbolizaba previamente. Lawn Managers, Inc. v. Progressive Lawn Managers, Inc., 959 F.3d 903, 908 (8vo Cir. 2020); 2 Taco Cabana Int'l, Inc. v. Two Pesos, Inc., 932

F.2d 1113, 1121 (5to Cir. 1991); Two Pesos, Inc. v. Taco Cabana, Inc., 505 U.S. 763 (1992); 2 McCarthy *supra*. Esto presenta un conflicto puesto que es esencial que las y los consumidores asocien la marca al negocio o industria al que pertenece. En pocas palabras, fragmentar la titularidad de una marca eliminaría su capacidad de identificar y distinguir el origen del producto o servicio. A su vez, esto generaría confusión y decepción en el cliente y perjudicaría la marca. 2 McCarthy, sec. 16:42. Al respecto, McCarthy indica que: "**[a] trademark cannot be sliced up and ownership of pieces of it apportioned among independent entities**. A trademark cannot be licensed to another without adequate control over the nature and quality of the licensee's sales of goods and services under the mark." 2 McCarthy, *supra* sec. 2:15. (Negrilla suplida).

Este choque de intereses entre los principios del derecho de marcas y los preceptos que rigen los derechos propietarios en nuestro ordenamiento jurídico se presta para distintas interpretaciones caso a caso sobre cómo atender los derechos de una marca al momento de disolver una entidad. A pesar de no existir una disposición expresa en la Ley de Marcas sobre este asunto, ni algún pronunciamiento de las cortes apelativas federales, algunas cortes de distrito se han expresado al respecto interpretando el *Lanham Act*. De esta forma han concluido que "[l]a mera disolución del ente titular de la marca no constituye una extinción de los derechos de las partes a la marca, todo lo contrario, la

disolución debe estar acompañada por la intención de descontinuar el interés en la marca y su plusvalía." [15] (Traducción suplida) <u>Sonista, Inc. v. Hsieh</u>, 348 F. Supp. 2d 1089, 1095 (2004) (*citando a Lanham Act*, *supra*). De esta manera, **la disolución de la entidad no es equivalente a la disolución de la marca.**

## III

Teniendo en cuenta la cualidad *sui generis* de la controversia que nos ocupa, en primera instancia debemos pasar juicio sobre quién ostenta los derechos propietarios de uso exclusivo sobre la marca *MECA*. Adelantamos que Mercado Caribeño hizo el primer uso comercial y que, por ende, es la titular de los derechos de uso exclusivo de *MECA*. Establecido esto, y dado que Mercado Caribeño fue disuelta, debemos delinear cómo deben proceder los tribunales cuando se presenta una demanda al amparo del Art. 26 de la Ley de Marcas, *supra*, en la que la corporación dueña se disolvió. Veamos.

Las demandantes-peticionarias sostienen que Mercado Caribeño realizó el primer uso comercial de la marca y que, al disolverse y no adjudicarse el derecho de uso, tal derecho se distribuyó entre sus socios. En consecuencia, arguyen que el derecho propietario sobre *MECA* lo ostentaba la corporación Mercado Caribeño. Sostienen que son titulares de

---

[15] Texto original en inglés: The mere dissolution of holder of trademark does not amount to extinction of rights of parties in that mark; instead, dissolution must be coupled with intent to discontinue interest in mark and goodwill accompanying it.

una porción del derecho de uso exclusivo sobre la marca *MECA*. Esto así ya que ambas fueron socias de la corporación Mercado Caribeño. Indican que, al disolverse y no adjudicarse el derecho de uso sobre la marca, surgió una comunidad de bienes y tal derecho se distribuyó entre sus socios. En consecuencia, explican que, como socias de la corporación, ostentan derechos y obligaciones en calidad de comuneras como ocurriría en una sucesión civil.

Por su parte, los demandados-recurridos sostienen que ellos, y no la corporación Mercado Caribeño, hicieron el primer uso comercial. En específico, indican que "llevaron a cabo actos afirmativos y esfuerzos, tanto a nivel local como internacional, para el desarrollo de la marca y la creación de una feria internacional de arte".[16] Arguyen que no fue hasta el 2017 que las demandantes-peticionarias comenzaron algún tipo de relación con los demandados-recurridos. Ambas partes están de acuerdo en que *MECA* no se adjudicó al momento de disolverse Mercado Caribeño.

**A**

Como discutimos anteriormente, el uso comercial de una marca se reduce a dos elementos: (1) el uso de la alegada marca fue de buena fe y (2) si fue seguido por actividades que demostraron un esfuerzo continuo de utilizar la marca en el contexto de la venta de un producto o el rendimiento de un servicio. Chance v. Pac-Tel Teletrac Inc., *supra*, pág.

---

[16] Alegato de la parte recurrida, José Daniel Báez Pérez y Jorge Antonio Rodríguez González, pág. 11.

1157 (*citando a* <u>Avakoff v. S. Pac. Co.</u>, *supra*, pág. 1098). Este uso no se demuestra mediante meras gestiones de planificación o promoción. El producto o servicio representado por la marca debe estar disponible para que el uso de la marca se entienda como uno comercial. La intención de uso no genera un derecho de uso exclusivo sobre la marca.

Repasado esto, evaluemos si los actos de los demandados-recurridos constituyeron un uso comercial. Del expediente surge que en el año 2015, los demandados-recurridos comenzaron a utilizar la palabra *MECA* en el internet. Dicho uso consistió en varias publicaciones en las redes sociales personales de los demandados-recurridos que aludían a un proyecto de índole creativo en desarrollo. En agosto de 2015, el señor Rodríguez González adquirió el dominio **mecaartfair.com.**

En el 2016, los demandados-recurridos realizaron varias publicaciones sobre un *MECA Art Fair* en diferentes revistas. Las publicaciones expresaban la **intención** de los demandados-recurridos, en conjunto con el Sr. Emil Medina y la señora Gonzáles, de realizar una feria de arte llamada *MECA* del 24 al 28 de mayo de 2017. Explicaron que su concepto consistía en tener de diez (10) a doce (12) espacios alternativos de exhibición en sincronía con la feria y que "la finalidad principal de MECA [era] fungir como vía para exponer internacionalmente a artistas locales", y atraer de diez mil

a quince mil asistentes.[17] En diciembre de ese año se llevó a cabo un coctel privado para lanzar la marca *MECA Art* y promover una feria de arte que se llevaría a cabo en el 2017.

Las actividades que llevaron a cabo los demandantes-recurridos pueden catalogarse como gestiones de planificación y promoción de la marca *MECA*. Ahora bien, dado que los servicios promocionados aún no se prestaban en el comercio, estas actividades no constituyen un uso comercial. Entiéndase, en el periodo de tiempo en el que se realizaron las gestiones de promoción y desarrollo detalladas por los demandados-recurridos, la marca *MECA* no apuntaba al origen de producto o servicio alguno. Más allá de las publicaciones en revistas durante el 2016, todas las promociones de la marca se dieron en las redes personales de los demandantes-recurridos y en eventos privados. Si bien demostraron una **intención** de uso, **los demandados-recurridos no solicitaron registro basándose en su intención** *bona fide* **de utilizar la marca en el futuro** y, como establecimos anteriormente, el *token use* en ausencia de un registro no es suficiente para reclamar derechos de uso exclusivo sobre una marca. Ante esto, no podemos concluir que las actividades que realizaron los demandados-recurridos constituyeron un uso comercial de la marca *MECA*. Como resultado, los demandados-recurridos no adquirieron derechos de uso exclusivo sobre la marca *MECA*.

Por su parte, las demandantes-peticionarias arguyen que

---

[17] Íd., pág. 645.

son titulares de una porción del derecho de uso exclusivo sobre la marca. Esto así ya que ambas fueron socias de la corporación Mercado Caribeño. Sostienen que esta corporación realizó el primer uso comercial de la marca y que, al disolverse y no adjudicarse el derecho de uso sobre la marca, tal derecho se distribuyó entre sus socios. No tienen razón.

Como se explicó anteriormente, el derecho de marcas tiene un propósito dual: proteger la plusvalía adquirida por la marca a través de uso en el mercado como producto o servicio, y proteger a los consumidores de la confusión que puede causar la existencia de dos marcas similares. En consecuencia, la marca está compuesta por el servicio o producto provisto que genera plusvalía y el denominador de origen que le representa. Por esta razón el derecho de uso exclusivo sobre la marca no puede adjudicarse a más de un titular. De permitirse, se estaría operando en contra del propósito del derecho marcario, a saber: (1) proteger la reputación de la marca en el mercado, y (2) evitar la probabilidad de confusión ante el público consumidor.

En este contexto es incorrecto el argumento de las demandantes-peticionarias a los efectos de que la disolución de la corporación redundó en que la marca le fuera cedida o traspasada. En el Acuerdo Operacional no se dispuso nada al respecto, como tampoco al disolver la corporación. Además, aquí no opera una cesión de derechos automática.

Tampoco corresponde determinar que la corporación Mercado Caribeño hizo uso de la marca de manera tal que las

demandantes-peticionarias, como socias de esta, advinieron titulares de un derecho de uso o heredaron la marca como ocurriría en una sucesión civil. En primer lugar, el derecho corporativo dicta que la corporación es un ente con personalidad jurídica propia y separada de sus socios y accionistas. Ante esto, no corresponde imputarle los actos de la corporación a las demandantes-peticionarias.

Asimismo, no podemos considerarles sucesoras en derecho de la corporación. Hemos establecido que los accionistas de una corporación disuelta no se pueden ver como los herederos de los activos y pasivos de la entidad. Esto así ya que, a diferencia de una sucesión civil, la corporación es un ente con personalidad jurídica propia. *MECA* constituye un activo que debe ser asignado. Su particularidad como marca dicta que esta es indivisible. En consecuencia, su titularidad debe adjudicarse. En vista de la ausencia de una adjudicación de la marca y dado la indivisibilidad que distingue al derecho marcario, no podemos concluir que las demandantes-peticionarias son dueñas de la marca *MECA*.

Dicho esto, no hay controversia en cuanto a que Mercado Caribeño, como ente con personalidad jurídica independiente de sus accionistas, utilizó la marca en conexión con los servicios de la feria durante los años 2017, 2018 y 2019. Ninguna de las partes cuestiona que el referido uso fue uno comercial. A saber, que: (1) fue de buena fe y (2) fue seguido por actividades que demostraron un esfuerzo continuo de utilizar la marca *MECA* en el contexto del rendimiento de

un servicio, en este caso, la feria. Fue esta actividad la que ató el denominador *MECA* a un servicio, y la que generó la plusvalía que lo convirtió en una marca para efectos del derecho marcario. Resulta claro, pues, que Mercado Caribeño es quien ostenta los derechos de uso exclusivo sobre *MECA*.

**B**

Adjudicada la titularidad, atendemos el asunto de los activos de Mercado Caribeño ante su disolución. En virtud de su personalidad jurídica, y de las facultades conferidas por el Art. 2.02 de la Ley de Corporaciones, *supra*, Mercado Caribeño puede ostentar, al igual que las demandadas-peticionarias y los demandados-recurridos, la titularidad sobre *MECA* como lo haría sobre otros tipos de bienes apropiables.

Como discutimos anteriormente, la Ley de Corporaciones reconoce la subsistencia de las corporaciones tras su disolución. Repasemos el Art. 9.08 de dicho estatuto que establece que:

> Toda corporación que se extinga por limitación propia o que por otro modo se disuelva, continuará como cuerpo corporativo por un plazo de tres (3) años a partir de la fecha de extinción o de disolución o por cualquier plazo mayor que el Tribunal de Primera Instancia (Sala Superior) en el ejercicio de su discreción disponga a los efectos de llevar adelante los pleitos entablados por la corporación y de proseguir con la defensa de los pleitos entablados contra ella, ya sean civiles, criminales o administrativos, **así como a los efectos de liquidar y terminar el negocio, de cumplir con sus obligaciones y de distribuir a los accionistas los activos restantes.** No podrá continuar la personalidad jurídica con el propósito de continuar los negocios para los cuales se creó dicha corporación. (Negrillas suplidas) 14 LPRA sec. 3708.

En el presente caso, Mercado Caribeño se disolvió el 17 de diciembre de 2021, esto es, hace dos (2) años y

nueve (9) meses. En consecuencia, la referida corporación aún subsiste para efectos de liquidación y distribución de sus activos. Sin embargo, y como adelantamos, el Art. 9.09 de la Ley General de Corporaciones, *supra*, provee para que ante la disolución de Mercado Caribeño, el Tribunal de Primera Instancia nombre un síndico o administrador judicial para que este se haga cargo del patrimonio de la corporación y realice la liquidación final de los asuntos corporativos pendientes aun cuando no haya transcurrido el periodo de tres (3) años.

Dada la particularidad de la controversia ante nuestra consideración, y con el propósito de abonar a la economía procesal y de proveer un remedio adecuado a las partes, consideramos pertinente activar el proceso estatuido en el Art. 9.09 de la Ley General de Corporaciones, *supra*, de manera tal que un síndico o administrador judicial supervise el proceso de liquidación de los activos de Mercado Caribeño, en específico, el proceso de liquidación de la marca *MECA*. Esta liquidación debe ser acorde a los pronunciamientos aquí hechos referentes a la indivisibilidad de la marca.[18] De esta manera, se salvaguardan los derechos tanto de la corporación, como de sus accionistas.

**IV**

Por los fundamentos expuestos, se revocan los dictámenes de los foros inferiores y se devuelve el caso al

---

[18] A pesar de que la marca es indivisible su valor es cuantificable y divisible, por lo que al momento de la liquidación este se podrá distribuir.

Tribunal de Primera Instancia para que este nombre un administrador judicial para la corporación que supervise el proceso de liquidación de la marca *MECA*.

Se dictará sentencia de conformidad.


                          Maite D. Oronoz Rodríguez
                             *Jueza Presidenta*

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Hazel Colón Vázquez y otros

   Peticionarios

      v.                          AC-2023-0005

José Daniel Báez Pérez y otros

   Recurridos

SENTENCIA

En San Juan, Puerto Rico, a 24 de septiembre de 2024.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se revocan los dictámenes de los foros inferiores y se devuelve el caso al Tribunal de Primera Instancia para que este nombre un administrador judicial para la corporación que supervise el proceso de liquidación de la marca *MECA*.

Así lo pronunció, manda el Tribunal y certifica el Secretario del Tribunal Supremo.

Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo